**CHILDREN'S HEALTHCARE IS A LEGAL DUTY, INC., a corporation under the laws of Iowa; Bruce Bostrom; and Steven Petersen, Plaintiffs,**

v.

**Bruce C. VLADECK, in his capacity as director of Health Care Finance Administration, an agency of the United States; and Donna Shalala, in her official capacity as Secretary of the United States Department of Health and Human Services, an agency of the United States, Defendants,**

and

**The First Church of Christ, Scientist, Boston, Massachusetts, Defendant–Intervenor.**

**Minnesota Civil Liberties Union, Amicus Curiae.**

Civil No. 3–96–63.

United States District Court, D. Minnesota, Third Division.

Aug. 7, 1996.

Robert J. Bruno, Burnsville, MN, for Plaintiffs.

Friedrich A.P. Siekert, Assistant United States Attorney, Minneapolis, MN, Sheila M. Lieber and Joseph W. LoBue, Civil Division, Department of Justice, and Lorie Mayorga, Office of the General Counsel, Department of Health and Human Services, of counsel, Washington, DC, for Defendants.

Stephen M. Shapiro, Kenneth S. Geller, and Michael W. McConnell, Mayer, Brown & Platt, Chicago, IL, and Terrence J. Fleming and Ansis V. Viksnins, Lindquist & Vennum P.L.L.P., Minneapolis, MN, for Defendant–Intervenor.

Gary D. Ansel, Reinhardt and Anderson, Saint Paul, MN, for Minnesota Civil Liberties Union, amicus curiae.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiffs challenge the constitutionality of certain exemptions for Christian Science sanitoria under Medicare and Medicaid, claiming that Congress' creation of such exemptions violates the Establishment Clause of the First Amendment. Plaintiffs have filed a Motion for Summary Judgment, and both Defendants and Defendant–Intervenor The First Church of Christ, Scientist ("the Church") have submitted Cross–Motions for Summary Judgment. For the reasons set forth below, the Cross–Motions brought by Defendants and the Church will be denied and Plaintiffs' Motion for Summary Judgment will be granted.

## Background

The relevant facts are largely undisputed. The First Church of Christ, Scientist was founded by Mary Baker Eddy in 1879 and has grown to include nearly 3,000 congregations worldwide. Fleming Supp.Aff., Ex. T, at 278–79; Swan Aff. ¶ 3. A primary tenet of Christian Science is the belief that disease is caused by sin and mortal frailties; accordingly, physical healing is believed to be dependent on prayer instead of medical technology. Fleming Supp. Aff., Ex. T, at 279. A Christian Scientist is not rigidly compelled by the Church to employ purely spiritual means for healing; yet the concept of spiritual healing is central to the religion. *Id.* Christian Science practitioners of spiritual healing are certified by the Church and listed in the Christian Science Journal, a periodic publication of the Church. *Id.*; Swan Aff. ¶ 7. The Church has established a process for certifying sanitoria which practice Christian Science healing methods; although Christian Science does not teach that medical care will cure the body, it is undisputed that these institutions provide bed and board as well as general personal care. *See, e.g., HCFA Christian Science Supplement* §§ CS–200(D); 204(A).

## Plaintiffs' Challenges to Medicare Act Exemptions

Part A of the Medicare Act, 42 U.S.C. §§ 1395 *et seq.*, creates a comprehensive health insurance program for the aged and disabled. The Act pays for hospital care and for post-hospitalization care provided by skilled nursing facilities, home health agencies, and hospices. 42 U.S.C. § 1395c. Payments under the Act are financed through a federal income tax on self-employment income (the Self–Employment Contributions Act) and federal employment taxes on wages paid to employees (mainly under the Federal Insurance Contributions Act, or "FICA"). Part B of the Medicare Act establishes a voluntary insurance program providing supplementary coverage for other medical expenses, such as physicians' fees and outpatient therapy. *See* 42 U.S.C. § 1395j, 42 U.S.C. § 1395k.

Plaintiffs challenge certain subsections and regulations of Part A of the Medicare Act which provide for the payment of nursing care and related services in Christian Science sanitoria. They note that most providers of health care under the Medicare Act are required to meet statutory and regulatory standards from which Christian Science sanitoria are exempted, and these exemptions form the basis of their claim under the Medicare Act.

First, Plaintiffs challenge the inclusion of Christian Science sanatoria in the Medicare Act definition of "hospital" in 42 U.S.C. § 1395x(e):

> The term "hospital" also includes a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts, but only with respect to items and services ordinarily furnished by such institution to inpatients, and payment may be made with respect to services provided by or in such an institution only to such extent and under such conditions, limitations, and requirements (in addition to or in lieu of the conditions, limitations, and requirements otherwise applicable) as may be provided in regulations.

Similarly, Plaintiffs challenge the inclusion of sanitoria in the definition of "skilled nursing facility" under 42 U.S.C. § 1395x(y)(1), which essentially mirrors the language quoted above. These provisions allow sanitoria to be eligible for benefits flowing from the Medicare and Medicaid programs.

Next, Plaintiffs challenge the exemption of Christian Science sanitoria from the requirements of 42 U.S.C. § 1320c. This section requires "quality control peer review organizations" to review the performance of physicians in the area, 42 U.S.C. § 1320c–3, requires practitioners to assure their patients that services will be provided in an economically efficient manner and only when medically necessary, 42 U.S.C. § 1320c–5, and sets limits on the disclosure of patient information, 42 U.S.C. § 1320c–9. However, "[t]he provisions of this part shall not apply with respect to a Christian Science sanitorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts." 42 U.S.C. § 1320c–11. The accompanying regulations also exempt Christian Science sanitoria from the more detailed

regulatory requirements of peer review organizations. 42 C.F.R. § 466.1.[1] Absent the provisions allowing sanitoria to come within the definition of "hospital" and "skilled nursing facility," and absent the provisions exempting them from the extensive regulations found in 42 C.F.R. §§ 482 and 483, Church-certified institutions would have to meet a number of requirements relating to care by licensed physicians and nurses in order to qualify for federal aid under the Act.

## Plaintiffs' Challenges to Medicaid Act Exemptions

Plaintiffs also challenge certain provisions of the Medicaid Act, found at 42 U.S.C. §§ 1396 et seq. The Act is designed to provide medical assistance to impoverished individuals who are aged, blind, or disabled, or are members of families with dependent children. 42 U.S.C. § 1396. The program is jointly financed by the federal and state governments, and is administered by the states.

42 U.S.C. § 1396a, 42 U.S.C. § 1396b(a), 42 U.S.C. § 1396d.

First, Plaintiffs attack the exclusion of Christian Science sanitoria from requirements imposed by state plans for medical assistance: "The provisions of paragraphs (9)(A),[2] (31),[3] and (33)[4] and of section 1396b(i)(4)[5] of this title shall not apply to a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts." 42 U.S.C. § 1396a(a). Plaintiffs attack only 42 U.S.C. § 1396a(a), and not the above-referenced provisions.

Plaintiffs also challenge a variety of regulations promulgated under the Act which are generally designed to ensure that sanitoria qualify for payment under the Medicaid Act for appropriate services: 42 C.F.R. § 431.610(b),[6] 42 C.F.R. § 440.155(b)(1),[7] 42 C.F.R. § 440.170(b),[8] 42 C.F.R. § 440.170(c),[9]

1. This regulation, which sets out definitions for use in later regulations concerning medical peer review, reads: "*Hospital* means a health care institution or distinct part of a health care institution ... other than a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts." 42 C.F.R. § 466.1. In addition, the same regulation also excludes Christian Science sanitoria from the definition of a "skilled nursing facility." *Id.* Thus, sanitoria do not have to adhere to the regulations which address review responsibilities of utilization and "quality control" peer review organizations. Since sanitoria do not provide medical care, the lack of a necessity for peer review of medical matters is evident.

2. This provision requires that a state plan for medical assistance must provide "that the State health agency, or other appropriate State medical agency ... shall be responsible for establishing and maintaining health standards for private or public institutions in which recipients of medical assistance under the plan may receive care or services." 42 U.S.C. § 1396(a)(9)(A).

3. This provision lays out reporting, inspection, and care requirements with respect to services in an intermediate care facility for the mentally retarded, where the state Medicaid plan includes medical assistance for such services. 42 U.S.C. § 1396a(31).

4. This provision requires that the state health agency establish a plan for review of the quality and care of services furnished to Medicaid recipients by professional health personnel. 42 U.S.C. § 1396a(33).

5. This subsection bars Medicaid payments from being made with respect to hospital services not made under a proper "utilization review plan." 42 U.S.C. § 1396b(i)(4). The structure of such a plan is described in 42 U.S.C. § 1395x(k), and is designed to provide for "in-house" review of admittance procedures and the services provided by the institution.

6. The provision reads:

A State plan must designate, as the State authority responsible for establishing and maintaining health standards for private or public institutions that provide services to Medicaid recipients, the same State agency that is used by the Secretary to determine qualifications of institutions and suppliers of services to participate in Medicare (see 42 C.F.R. § 405.1902). The requirement for establishing and maintaining standards does not apply with respect to Christian Science sanitoria operated, or listed and certified, by the First Church of Christ Scientist, Boston, Mass.

7. This provision includes in the definition of "nursing facility services" those services "[c]onsidered appropriate by the State and provided by a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ Scientist, Boston, Mass." Accordingly, certain services provided by a Christian Science sanitorium qualify for payment under the Medicaid Act.

8. 42 C.F.R. § 440.170(b) defines "services of Christian Scientist nurses" to be services provided by nurses "who are listed and certified by the First Church of Christ, Scientist, Boston, Mass."

and 42 C.F.R. § 442.12(b).[10]

In addition, Plaintiffs attack regulations which exclude Christian Science sanitoria from definitions of "skilled nursing facilities" (42 C.F.R. § 456.251) and "intermediate care facilities" (42 C.F.R. § 456.351 and 42 C.F.R. § 456.601). Such exclusions remove sanitoria from compliance with various certification requirements for medical care, with which other institutions must comply in order to receive payment under the Medicaid Act. Defendants note, however, and Plaintiffs do not dispute, that these particular regulations have been largely superseded by changes to the "utilization review plan" requirements in both the Medicare and Medicaid Acts. Mem. in Supp. of Defs.' Mot. for Summ.J. and in Opp'n to Pls.' Mot. for Summ.J. 9 n. 9.

Finally, Plaintiffs challenge both a statutory provision, 42 U.S.C. § 1396g(e)(1), and a regulatory provision, 42 C.F.R. § 431.701, which exempt Christian Science sanitoria from the definition of "nursing home," allowing them to receive payments under Medicaid and Medicare without complying with state requirements for the licensing of nursing home administrators.[11]

In sum, Plaintiffs challenge the constitutionality of fifteen provisions of the Medicare and Medicaid Acts and the accompanying regulations.

**Procedural History**

Plaintiffs seek: 1) a declaratory judgment adjudging the above statutory and regulatory provisions to be null and void; 2) preliminary and permanent injunctions restraining Defendants from enforcing the exemptions and

paying Medicare or Medicaid funds to Church-certified sanitoria; and 3) Plaintiffs' costs of suit and attorneys' fees. Compl. at 23–24. Plaintiffs' Motion for Summary Judgment, as well as the Complaint, contend that the challenged provisions violate the Establishment Clause of the First Amendment in four respects: 1) they give aid to pervasively sectarian institutions which exist solely to promote Christian Science spiritual treatment; 2) they represent a "sect-specific direct subsidy" of Christian Science religious rituals; 3) they delegate to the Church the power to operate, list and certify institutions which will qualify for favorable treatment under the Acts; and 4) they constitute a governmental preference, both real and symbolic, for the practice of Christian Science spiritual treatment.

The Church was allowed to intervene as a Defendant.

Defendants and the Church have also filed Motions for Summary Judgment. The Minnesota Civil Liberties Union as amicus curiae was allowed to file two briefs in support of Plaintiffs' Motion for Summary Judgment. The hearing on the three outstanding Motions was held before the undersigned on June 4, 1996.

**Discussion**

**I. Summary Judgment Standard**

Federal Rule of Civil Procedure 56 states:

[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions

---

if: 1) the services have been requested by the recipient; and 2) the services are provided under the supervision of a Christian Science visiting nurse organization, or as "private duty services" in a patient's home.

9. This provision defines "services in Christian Science sanatoriums" to mean "services provided in Christian Science sanatoriums that are operated by, or listed and certified by, the First Church of Christ, Scientist, Boston, Mass." 42 C.F.R. § 440.170.

10. This provision, following the language of the Medicaid Act, exempts Christian Science sanitoria from the certification provisions for intermediate care facilities designed to care for mentally retarded patients. *See* 42 U.S.C. § 1396a(a).

11. While the Medicare Act makes specific allowances for Christian Science sanitoria, the Medicaid Act merely permits individual states to provide benefits to "any other type of remedial care recognized under state law, specified by the Secretary." 42 U.S.C. § 1396d(a)(25). The Secretary has specified, in two of the challenged regulatory provisions already discussed, that "remedial care" may include services provided by Christian Science sanitoria and nurses. 42 C.F.R. §§ 440.170(b), (c). The Secretary has also recognized, in another contested provision, that "nursing facility services" include services "[c]onsidered appropriate by the State and provided by a Christian Science sanatorium." 42 C.F.R. § 440.155(b)(1).

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the party not moving for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The party moving for summary judgment bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The evidence of the nonmoving party is to be believed and all justifiable inferences are to be drawn in a light most favorable to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *see also Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995). Where a moving party makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the adverse party's response must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. *See also* Fed.R.Civ.P. 56(e). The parties agree that no genuine issues for trial exist.

## II. Establishment Clause Review—The Proper Standard

When an act of government is challenged under the Establishment Clause,[12] the familiar three-pronged test announced in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), is often applied. To survive an Establishment Clause challenge under the *Lemon* test, a law must: "(1) reflect a clear secular purpose; (2) have a

primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion." *Lee v. Weisman*, 505 U.S. 577, 585, 112 S.Ct. 2649, 2654, 120 L.Ed.2d 467 (1992) (applying *Lemon*).

Yet the use of the *Lemon* test in Establishment Clause cases was limited by *Larson v. Valente*, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). *Larson* inaugurated a harsher test of strict scrutiny when "the law facially differentiates among religions." 456 U.S. at 246, 102 S.Ct. at 1684. Such a law must be "closely fitted to the furtherance" of a "compelling government interest" in order to pass constitutional muster. 456 U.S. at 255, 102 S.Ct. at 1689. The more difficult standard is merited because "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." 456 U.S. at 244, 102 S.Ct. at 1683.

In *Larson*, the Court struck down a Minnesota law which provided that only those religious organizations receiving more than half of their total contributions from members or affiliated organizations were exempt from registration and reporting requirements found in the Minnesota Charitable Solicitation Act. The Act provided for a system of registration and disclosure for charitable organizations; prior to 1978, all religious organizations had been exempted from the Act's requirements. The Court applied strict scrutiny to the law because it demonstrated a denominational preference: older, more established churches were given an advantage over newer religions which depended more heavily on contributions from the general public. 456 U.S. at 246, 102 S.Ct. at 1684. The Court subsequently found that the law evinced the explicit intention of including particular religious denominations and excluding others, and was not closely fitted to the furtherance of any compelling governmental interest. 456 U.S. at 255, 102 S.Ct. at 1689.

12. "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I.

Post–*Larson* jurisprudence indicates that dissension exists over whether *Larson* should be applied in conjunction with or completely apart from *Lemon;* notably, the *Lemon* test has also suffered criticism, but has never been overruled. The majority in *Lynch v. Donnelly*, 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984),[13] observed that the *Larson* Court eschewed the *Lemon* test in a situation "where there was substantial evidence of overt discrimination against a particular church." In a concurring opinion, Justice O'Connor suggested that the *Larson* standard may be "assimilated" to the *Lemon* test. 465 U.S. at 689 n. *, 104 S.Ct. at 1367 n. * (O'Connor, J., concurring). She proposed that "[p]lain intentional discrimination should give rise to a presumption, which may be overcome by a showing of compelling purpose and close fit, that the challenged government conduct constitutes an endorsement of the favored religion or a disapproval of the disfavored." *Id. See Board of Educ. of Kiryas Joel v. Grumet*, 512 U.S. 687, ——, 114 S.Ct. 2481, 2494–95, 129 L.Ed.2d 546 (1994) (Blackmun, J., concurring) ("I write separately only to note my disagreement with any suggestion that today's decision signals a departure from the principles described in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)."); *see also School Dist. of City of Grand Rapids v. Ball*, 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985) ("We therefore reaffirm that state action alleged to violate the Establishment Clause should be measured against the *Lemon* criteria.").[14] Moreover, in *Kiryas Joel*, in which the Court invalidat-ed the formation of a school district whose boundaries were coterminous with that of a religious community, *Larson* was cited but strict scrutiny was not explicitly applied.

▮ Here, the contested provisions explicitly address institutions of a single religion. Defendants and the Church attempt to avoid the higher standard of *Larson* altogether by noting that *Larson* did not involve an effort to accommodate religious beliefs, but rather to disadvantage a particular group. Defs.' Reply in Supp. of Defs.' Mot. for Summ.J. 12; Reply Brief in Supp. of Mot. of Def.–Intervenor First Church of Christ, Scientist, for Summ.J., and in Opp'n to Pl.'s Mot. for Summ.J. 8. Nowhere in *Larson* or the subsequent cases are these distinguishing factors; instead, the sole distinguishing factor *Larson* espouses is a differentiation between religious groups on the face of a statute. Nor does case law distinguish between the application of *Larson* (a challenge under the Free Exercise Clause) to Establishment Clause challenges as opposed to cases under the Free Exercise Clause. This Court reads the decision in *Hernandez v. C.I.R.*, 490 U.S. 680, 695, 109 S.Ct. 2136, 2146, 104 L.Ed.2d 766 (1989),[15] to mandate that the proper and initial inquiry is whether the law facially differentiates among religions, whether the case is brought under the Establishment Clause or the Free Exercise Clause. If the law does facially differentiate, strict scrutiny applies; if it does not, courts should proceed to apply the *Lemon* test.[16] As noted by the

---

**13.** *Lynch* involved a Christmas display, which included a crèche, owned by the city of Pawtucket, Rhode Island. The display as a whole was held not to violate the Establishment Clause.

**14.** The *Grand Rapids* case did not mention the *Larson* test, but neither did it involve aid to a particular denomination.

**15.** The Court in *Hernandez* recognized the establishment of a two-level inquiry:

> *Larson* teaches that, when it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions. If no such facial preference exists, we proceed to apply the customary three-pronged Establishment Clause inquiry derived from *Lemon v. Kurtzman* [citation omitted].

490 U.S. at 695, 109 S.Ct. at 2146. *See also, e.g., Wilson v. NLRB*, 920 F.2d 1282, 1287 (6th Cir. 1990), *cert. denied*, 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992) ("When a law facially differentiates among religions, it is subject to strict scrutiny and it 'must be invalidated unless it is justified by a compelling governmental interest.'" (quoting *Larson*, 456 U.S. at 247, 102 S.Ct. at 1685)).

**16.** Both Defendants and the Church cite *Peyote Way Church of God v. Thornburgh*, 922 F.2d 1210 (5th Cir.1991), as supporting the idea that *Larson* does not necessarily apply when the federal government singles out a religious sect for special treatment. The court in *Peyote Way* was faced with a challenge to federal and Texas laws prohibiting peyote possession by all except members of the Native American Church of North Amer-

District of Columbia Circuit, this situation is especially appropriate for review under *Larson:* "A statutory exemption authorized for one church alone, and for which no other church may qualify, presents a 'denominational preference' not easily reconciled with the establishment clause." *Olsen v. DEA,* 878 F.2d 1458, 1461 (D.C.Cir.1989), *cert. denied,* 495 U.S. 906, 110 S.Ct. 1926, 109 L.Ed.2d 290 (1990) (R.B. Ginsburg, J.) (citing *Larson,* 456 U.S. at 245, 102 S.Ct. at 1683–84).[17]

■ Since such differentiation is present here in the context of a statutory exemption, the strict scrutiny test of *Larson* must be applied. The inquiry becomes whether the Medicare and Medicaid exemptions for Christian Scientists are "closely fitted" to the furtherance of a "compelling" governmental interest.

### III. The Government's Interest

#### A. Background of the Medicare and Medicaid Acts

A logical place to commence the inquiry of whether the government's interest in the challenged provisions may be termed "compelling" is to look at the purpose of the Acts and the provisions themselves. Both Acts guarantee their beneficiaries (which, togeth-er, include or will eventually include most of this country's population) the freedom to select a health care provider. The Medicare Act states: "Any individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter if such institution, agency, or person undertakes to provide him such services." 42 U.S.C. § 1395a. The Medicaid Act likewise provides: "... any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community, pharmacy, or person, qualified to perform the service or services required ... who undertakes to provide him such services...." 42 U.S.C. § 1396a. The Acts also forbid governmental attempts to compel a certain type or manner of health care services. *See* 42 U.S.C. § 1395a;[18] 42 U.S.C. § 1396f.[19]

More specifically, the legislative history demonstrates that the challenged provisions of the Acts were the product of careful congressional deliberations. To its credit, Congress recognized the inherent tension between the Establishment Clause and the Free Exercise Clause. If Congress decided to include no religious exemptions to the Acts, they would likely face a free exercise challenge, as they would force members of

---

ica. The Fifth Circuit, it is true, did not apply *Larson,* but, upon a careful reading of the case, the reason it did not do so becomes clear: "The unique guardian-ward relationship between the federal government and Native American tribes precludes the degree of separation of church and state ordinarily required by the First Amendment." *Id.* at 1217. *Peyote Way* thus does not aid this Court's analysis.

**17.** Justice O'Connor has posited that the *Larson* standard, which she recognizes as applying to statutes which plainly embody an intentional discrimination among religions, may also be conformed to the Supreme Court's standard for finding "endorsement" of a religion. "Plain intentional discrimination should give rise to a presumption, which may be overcome by a showing of compelling purpose and close fit, that the challenged government conduct constitutes an endorsement of the favored religion or a disapproval of the disfavored." *Lynch v. Donnelly,* 465 U.S. 668, 688 n. *, 104 S.Ct. 1355, 1367 n. *, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring).

**18.** This section of the Medicare Act makes clear that it does not "authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided ... or to exercise any supervision or control over the administration or operation of any such institution, agency or person."

**19.** This section of the Medicaid Act also indicates that Congress considered the impact of such a broad health care program on the religious rights of its beneficiaries:

Nothing in this subchapter shall be construed to require any State which has a plan approved under this subchapter to compel any person to undergo any medical screening, examination, diagnosis, or treatment or to accept any other health care or services provided under such plan for any purpose (other than for the purpose of discovering and preventing the spread of infection or contagious disease or for the purpose of protecting environmental health), if such person objects (or, in case such person is a child, his parent or guardian objects) thereto on religious grounds.

religious groups to contribute to a health benefit fund from which they would be barred from participation because of their religious beliefs.[20] As this suit shows, it is often extremely difficult for Congress to navigate between the Scylla and Charybdis of these two Clauses.[21]

During the hearings leading up to the passage of the Acts, representatives of Christian Science asked that Congress provide an exemption from the portion of social security and railroad retirement taxes which would pay for medical health insurance, since their religion did not employ medical treatment and care. *Hearings on H.R. 4222 Before the House Ways & Means Comm.*, 87th Cong., 1st Sess. 728–29 (1961) (testimony of Dr. J. Boroughs Stokes). Congress instead opted to accommodate Christian Science in another way, by, first, including Christian Science sanitoria and nurses under the programs, and, second, excusing them from certain requirements tied to medical treatment not undertaken by Christian Science nurses or in Christian Science sanitoria.

Aside from the Acts themselves, two segments of legislative history illustrate the congressional intent behind this dual accommodation. First, the Senate Report accompanying the Social Security Amendments of 1965 (providing for the Medicare Act) stated:

> Christian Science sanatoriums that are operated or listed and certified by the First Church of Christ, Scientist, in Boston, could participate in the program as "hospitals." The participation of these institutions and the payment for items and services furnished by them would be subject to such conditions, limitations, and requirements as may be provided in regulations. In general, however, the committee intends that payments to Christian Science sanatoriums would cover costs of services ordinarily furnished by these sanatoriums to patients which are comparable to those for which payment could be made to hospitals and intends these sanatorium services

to be a substitute for, and not an addition to, medical services that might be furnished to a person if his religious beliefs were not contrary to the use of the usual facilities.

*S.Rep. No. 404*, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N.1943, 1971.

Seven years later, in considering the Social Security Amendments of 1972, the House Report laid out the rationale for exempting sanitoria from generally applicable medical care requirements:

> Your committee believes that Christian Science sanatoriums, which do not actually provide medical care, should not be required to have a skilled nursing home administrator licensed by the State, to maintain an organized nursing service under the direction of a registered nurse, to maintain detailed medical records, or to have diagnostic and other service arrangements with general hospitals. The bill would therefore exempt Christian Science sanatoriums from the requirements for a licensed nursing home administrator and other inappropriate medical requirements of the medicaid program. Such sanatoriums would be expected to continue to meet all applicable safety standards.

*H.R.Rep. No. 231*, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 4989, 5106.

**B. Compelling Interests**

■ Plaintiffs first argue under the auspices of the "purpose" prong of *Lemon*, that Congress has no "legitimate, valid secular purpose in lowering or eliminating standards for some of the elderly or needy based upon a standardless certification" by the Church. Pl.'s Mem. in Supp. of Mot. for Summ.J. 11–12. Then arguing under *Larson*, Plaintiffs contend that the government "has no compelling interest in reimbursing non-medical methods of care that are not state-licensed and have no scientific data indicating their therapeutic or prophylactic effectiveness."

---

20. This is not to say, however, that such a free exercise challenge would succeed. *See infra* Section III.B.3.

21. In Homer's *Odyssey*, Odysseus was forced to guide his ship between the twin perils of Scylla, a

six-headed monster who would devour six of his crewmen, and Charybdis, a violent whirlpool which threatened to drag his ship into certain oblivion. *See* Homer, *The Odyssey* 191–96 (E.V. Rieu trans., Penguin Books 1960).

Pl.'s Combined Reply Mem. in Supp. of Their Mot. for Summ.J. and Responsive Mem. to Defs.' Mots. for Summ.J. 9. Of course, these assertions do not address the obvious concern of Congress in passing these exemptions: forcing Christian Scientists to choose between: 1) following their religion and enduring financial hardship; or 2) violating an apparently deeply held belief and receiving Medicare and Medicaid benefits. Congress instead made an accommodation to avoid such a choice, allowing Christian Scientists to participate in these otherwise available public programs, to which they have almost certainly contributed part of their wages.

■ The Court will now address whether this interest may properly be labelled "compelling."

### 1. Accommodations Sometimes Constitutionally Required

Accommodations of religion have been held to be *required* by the Free Exercise Clause in certain situations. In *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), the Court held that a state's denial of unemployment benefits to a Jehovah's Witness because his religious beliefs forbade his participation in the production of armaments violated the Free Exercise Clause. In making clear that the state was compelled to consider religious beliefs in the application of its unemployment compensation law, the Court stated: "a person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program." 450 U.S. at 716, 101 S.Ct. at 1431 (citing *Everson v. Board of Educ.*, 330 U.S. 1, 16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947)). The Court went on to say:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial

pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

450 U.S. at 717–18, 101 S.Ct. at 1432.

Similarly, the Court has held that a refusal to award unemployment compensation benefits when an applicant declines to work certain hours for valid religious reasons violates the Free Exercise Clause. *See Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (denial of benefits to Seventh–Day Adventist who refused to work certain hours violated Free Exercise Clause); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (denial of benefits to Sabbatarian who refused to work on Saturdays violated Free Exercise Clause).[22] In *Hobbie*, citing the language from *Thomas* quoted above, the Court reaffirmed its earlier holdings that "such infringements must be subjected to strict scrutiny and could be justified only by proof by the State of a compelling interest." 480 U.S. at 141, 107 S.Ct. at 1049.

### 2. Accommodation Statutorily Required

At oral argument, counsel for Plaintiffs claimed that *Thomas, Hobbie,* and *Sherbert* had no application outside the unemployment compensation arena. The Supreme Court has indeed expressed such doubt. In *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 883, 110 S.Ct. 1595, 1602, 108 L.Ed.2d 876 (1990), the Court noted that it had never invalidated any governmental action on the basis of the *Sherbert* "compelling interest" test except the denial of unemployment compensation, and observed that the *Sherbert* test may have fallen into disuse. *Id.* The holding in *Smith*, however, is only that the *Sherbert* test should not be applied to require exemptions from a generally applicable *criminal* law. 494 U.S. at 884, 110 S.Ct. at 1603.

**22.** The *Sherbert* Court quoted *Everson v. Board of Education*, 330 U.S. 1, 16, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947) for the proposition that no state may exclude "individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non- believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation." 374 U.S. at 410, 83 S.Ct. at 1797 (emphasis in original).

In 1993, Congress expressly disapproved of the holding of *Smith* in the passage of the Religious Freedom Restoration Act ("RFRA"). In the Act, Congress found that:

> (4) in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and
>
> (5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

42 U.S.C. § 2000bb(a).

Congress defined its purposes in passing the Act:

> (1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and
>
> (2) to provide a claim or defense to a person whose religious exercise is substantially burdened by government.

42 U.S.C. § 2000bb(b).

In furtherance of this purpose, the RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," except if it demonstrates that the restriction is in furtherance of a compelling governmental interest, and is the least restrictive means of advancing that interest. 42 U.S.C. § 2000bb-1. Congress also expressed its intent not to interfere with Establishment Clause jurisprudence:

> Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause"). Granting government funding benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter.

42 U.S.C. § 2000bb-4.[23]

Thus, while the RFRA by its very language has no direct impact on this Establishment Clause case, it demonstrates the importance Congress attaches to the free exercise of religion by extending the *Sherbert* line of cases to all burdens on free exercise. It must be pointed out, however, that this extension of *Sherbert* has not been held to be constitutionally mandated, but represents a "legislatively mandated accommodation of the exercise of religion." *EEOC v. Catholic University of America*, 83 F.3d 455, 470 (D.C.Cir.1996) (quoting *Flores v. City of Boerne, Texas*, 73 F.3d 1352, 1364 (5th Cir. 1996)).[24]

In any case, it is difficult to square the dicta in *Smith* with recent Supreme Court precedent which recognizes "the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." *Kiryas Joel*, — U.S. at —, 114 S.Ct. at 2492 (quoting *Hobbie* for the proposition that "government may (and sometimes must) accommodate religious practices and ... may do so without violating the Establishment Clause").

---

**23.** The efficacy of this provision is somewhat doubtful, since there is a fair deal of interplay between the Free Exercise Clause and the Establishment Clause. For example, under the *Larson* test, the government must show a compelling interest for facially differentiating between sects; yet if it did not distinguish between sects here, and the Christian Scientists claimed (as they reasonably could) that the Medicare and Medicaid Acts substantially burdened the exercise of their religion, Congress would have to demonstrate a compelling interest for *not* exempting them from certain requirements of the programs.

This awkward situation leads to strict scrutiny of Congress' action, no matter which path it chooses to take.

**24.** At least one Eighth Circuit judge has stated his belief that the RFRA is unconstitutional. *Hamilton v. Schriro*, 74 F.3d 1545, 1563-70 (McMillian, J., dissenting). In any case, it should be noted that the RFRA explicitly does not apply to the Medicare and Medicaid Acts, as it only subjects "[f]ederal statutory law adopted after November 16, 1993" to its provisions.

It is even more difficult to harmonize the dicta in *Smith* with precedent from this Circuit. In *Quaring v. Peterson*, 728 F.2d 1121 (8th Cir.1984), *aff'd by an equally divided Court*, 472 U.S. 478, 105 S.Ct. 3492, 86 L.Ed.2d 383 (1985) (per curiam), the court determined that Nebraska's requirement that applicants for a driver's license submit to having color photographs taken and affixed to the license unconstitutionally burdened the plaintiff's free exercise of her religious beliefs. Allowing her to receive her license without a photograph was found to be a reasonable accommodation of her religion.

Finally, unemployment compensation laws and the Acts in question are very similar in nature, even considering that decisions to award or deny unemployment compensation are often context-specific—they are public benefits programs widely available to the public.

Congress has indicated that it favors the accommodation of the exercise of religion as a very important interest. This interest is magnified when the accommodation is made to ensure participation in a comprehensive welfare system. *See In re Young*, 82 F.3d 1407, 1419 (8th Cir.1996) (citing *Droz v. Commissioner of I.R.S.*, 48 F.3d 1120, 1122–23 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 656 (1996)).

### 3. Accommodation Required by the Free Exercise Clause is Not Co–Extensive with Permissible Actions Under Establishment Clause

 This is not to say, however, that the present accommodation is mandated by the Free Exercise Clause. The exemptions here would not be considered constitutionally compelled by the Free Exercise Clause, since, absent the Christian Science exemptions, the Medicare and Medicaid Acts are laws "entirely neutral in [their] general appli-

cation" and concern taxes imposed nationwide. *United States v. Lee*, 455 U.S. 252, 263, 102 S.Ct. 1051, 1058, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring). But the fact that the exemptions are not constitutionally compelled does not mean that they do not represent a permissible accommodation. "The limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 673, 90 S.Ct. 1409, 1413–14, 25 L.Ed.2d 697 (1970); *see also Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n. 8, 109 S.Ct. 890, 901–02 n. 8, 103 L.Ed.2d 1 (1989) ("[W]e in no way suggest that *all* benefits conferred exclusively upon religious groups or upon individuals on account of their religious beliefs are forbidden by the Establishment Clause unless they are mandated by the Free Exercise Clause."); *Corporation of the Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334, 107 S.Ct. 2862, 2867, 97 L.Ed.2d 273 (1987) (quoting *Walz*'s statement that limits on accommodation are not co-extensive with noninterference mandated by Free Exercise Clause); *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (upholding New York City's accommodation of students' religious preferences by giving them option of staying in public school or leaving to attend religious classes for part of day, even though accommodation evidently was not mandated by Free Exercise Clause).[25]

Based on this principle, this Court determines that the interest in accommodating religious beliefs in the context of generally available public welfare programs, in order to ensure that all those who pay taxes to support the programs may benefit from them, is a sufficiently compelling interest to survive the first prong of strict scrutiny review. The

---

**25.** Yet in these cases, the relevant law did not discriminate between sects, illustrating a second relevant point: " 'Neutrality' in matters of religion is not inconsistent with 'benevolence' by way of exemptions from onerous duties [citing *Walz*], so long as an exemption is tailored broadly enough that it reflects valid secular purposes." *Gillette v. United States*, 401 U.S. 437, 454, 91 S.Ct. 828, 838, 28 L.Ed.2d 168 (1971), *quoted with approval in Bullock*, 489 U.S. at 13 n. 3, 109

S.Ct. at 899 n. 3. *See also Committee for Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 793–94, 93 S.Ct. 2955, 2975–76, 37 L.Ed.2d 948 (1973) (noting that breadth of exemption for religious groups is "important factor" in assessing constitutionality). The different tests in *Lemon* and *Larson* confirm that laws which treat religion broadly receive less scrutiny than laws which contemplate only one religious sect. This problem is addressed in the next Section.

Court must now determine whether the exemptions are "closely fitted" to the furtherance of that interest, in light of the principle of neutrality among religions.

## IV. Close Fit Is Absent

Notably, the Minnesota statute at issue in *Larson*, distinguishing between religions on the basis of their revenue sources, was not struck down because of the lack of a compelling interest. The Court assumed, *arguendo*, that the state's interest in "protecting its citizens from abusive practices in the solicitation of funds for charity" was sufficiently "compelling." In doing so, the Court relied on the fact that the statute, "viewed as a whole, has a valid secular purpose." 456 U.S. at 248, 102 S.Ct. at 1685. The Court has already determined that the interests served here are compelling, supported by the nature of Medicare and Medicaid as generally available public welfare programs. This determination accords with exhortations by the Church and Defendants to view the Acts in their entirety, instead of focusing solely on the Christian Science exemptions.

Yet, when it comes to determining a close fit, this Court cannot view the Medicare and Medicaid Acts holistically. In the context of the overall Medicare and Medicaid programs, the accommodation's impact is of course very small—more than 99.9% of all institutions receiving funds are not Church-certified. Ault Decl. ¶¶ 3–4. Yet *no* other group, religious or non-religious, is entitled to the exemptions declared by the statute on its face. The *Larson* Court plainly stated that "our inquiry must focus more narrowly, upon the distinctions drawn by § 309.515, subd. 1(b) itself: Appellants must demonstrate that the challenged fifty per cent rule is closely fitted to further the interest that it assertedly serves." *Id.*

### A. The Exemptions Are Too Narrowly Confined

▮▮▮▮ This Court is faced with two programs which, while providing generally available public benefits, authorize exemptions to the programs in expressly sectarian terms. The exemptions here address *only* Christian Science nurses and sanitoria. This is the narrowest of categories. Standing alone, the specificity of the exemption is very significant. Of course, the compelling interest is the accommodation of the free exercise of religion in the Medicare and Medicaid programs, not the accommodation of the Christian Science method of healing in particular. If the exemptions are meant to accommodate the free exercise of religion, it is troubling that the exemptions adopt the standards and certification procedures of only one. Like *Larson*, this Court concludes that the sect-specific exemptions are not closely fitted to the identified governmental interest.

While the *Walz* Court noted that Congress could pass laws which complied with the Establishment Clause, yet were not compelled by the Free Exercise Clause, the Court's opinion in *Kiryas Joel* puts that holding in perspective:

> In *Walz* ..., for example, the Court sustained a property tax exemption for religious properties in part because the State had "not singled out one particular church or religious group or even churches as such," but had exempted "a broad class of property owned by nonprofit, quasi-public corporations." ... And *Bowen* ... upheld a statute enlisting a "wide spectrum of organizations" in addressing adolescent sexuality because the law was "neutral with respect to the grantee's status as a sectarian or purely secular institution." ... Here, the benefit flows only to a single sect, but aiding this single, small religious group causes no less a constitutional problem than would follow from aiding a sect with more members or religion as a whole. ...

512 U.S. at ——, 114 S.Ct. at 2491–92 (citations and footnote omitted).

The exemptions here are not nearly as broad as those in *Bowen* or *Walz*. While it is true that the benefits under Medicaid and Medicare are generally available, and do not require a resort to Christian Science, the benefits provided under the statutes are not uniform—institutions which would not otherwise qualify for the receipt of funds are able to receive such funds by virtue of their status as Christian Science sanitoria. Accordingly, in determining whether the exemption is a

permissible accommodation or an impermissible establishment, its sect-specific nature tips the scales toward a finding of establishment under Supreme Court jurisprudence.

In so finding, the Court does not ignore the laudable purpose behind the exemptions. The care given in Christian Science sanitoria and performed by Christian Science nurses certainly does "cohere" with the Church's religious mission. *See Cohen v. City of Des Plaines,* 8 F.3d 484, 492 (7th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994). As such, the Medicare and Medicaid exemptions *do* operate to remove a burden to the free exercise of the Christian Science religion, without necessarily increasing the tax bills of non-Christian Scientists; the exemptions, however, are not compelled by the Free Exercise Clause. *Cf. Cohen,* 8 F.3d at 492–93 (distinguishing case from *Bullock* because, in present case, free exercise concerns existed and law did not burden non-beneficiaries).

The Court also notes that the importance of accommodation was recognized in *Larson,* the case which imposed strict scrutiny on sect-specific classifications: "This constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause." 456 U.S. at 245, 102 S.Ct. at 1683. The *Larson* Court further noted that, when balancing the Establishment and Free Exercise Clauses, " 'the fullest realization of true religious liberty requires that government ... effect no favoritism among sects ... and that it work deterrence of no religious belief.' " 456 U.S. at 246, 102 S.Ct. at 1684 (quoting *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 305, 83 S.Ct. 1560, 1615, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring)).

Yet even the most honorable of intentions cannot cure the constitutional defect. The general interest of religious accommodation is consistent with the values supporting the First Amendment; this particular manner of accommodation is not.

Counsel for Defendants noted at oral argument that the reason Christian Science sanitoria were singled out by name in the exemptions was that, at the time the Medicare and Medicaid Acts were being contemplated and refined by Congress, it was the only religious group which came forward with a network of health care facilities standing as an alternative to traditional medical care. This, it is argued, makes Christian Science unique and allows the sect-specific language in the Acts. This logic clashes with the rationale of *Kiryas Joel.* "The fundamental source of constitutional concern here is that the legislature itself may fail to exercise governmental authority in a religiously neutral way." —— U.S. at ——, 114 S.Ct. at 2491. Just as the community of Kiryas Joel did not receive its accommodation "simply as one of many communities eligible for equal treatment under a general law," the Christian Scientists did not receive their accommodation in such a manner. *Id.* As in *Kiryas Joel,* there is no guarantee that a religious group in a similar situation to the Christian Scientists (*i.e.,* a religious group believing in faith healing which has set up certain institutions to promote such healing) would receive a similar accommodation from Congress. *Id.* This Court may not assume that there is not nor will there ever be a group in a situation similar to that of the Christian Scientists' current position in order to justify the restriction. While it is a compelling interest to ensure that all eligible citizens receive appropriate coverage under Medicare and Medicaid, it is not a close fit to utilize the standards of only one sect in attempting to further that interest.

The Court has not ignored the Church's and Defendants' citation to *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). In *Lee,* a member of the Amish religion claimed that the imposition of social security taxes on his employees violated the Free Exercise Clause, as both he and his employees were opposed to the national social security system. The Social Security Act, like the Medicare and Medicaid Acts, is a publicly available welfare program funded primarily by employment taxes. Congress, however, created the possibility for religious self-employed individuals to exempt themselves from the Act, in accordance with 26 U.S.C. § 1402(g), which reads:

Any individual may file an application ... for an exemption from the tax imposed by

this chapter if he is a member of a recognized religious sect or division thereof and is an adherent of established tenets or teachings of such sect or division by reason of which he is conscientiously opposed to acceptance of the benefits of any private or public insurance which makes payments in the event of death, disability, old-age, or retirement or makes payments toward the cost of, or provides services for, medical care (including the benefits of any insurance system established by the Social Security Act). In order to qualify for the exemption, the applicant must waive his right to all social security benefits and the Secretary of Health and Human Services must find that the particular religious group makes sufficient provision for its dependent members.

Unlike the exemptions at issue here, this provision does not explicitly refer to the protection of the Old Order Amish. Yet the restrictions placed on the exercise of this exemption made clear that this exemption was intended for a very small number of existing religious groups. The exemption only becomes active if the Commissioner of Social Security finds that it has been the practice of the religious group to provide for its dependent members for a substantial period of time, 26 U.S.C. § 1402(g)(1)(D), and if the group has been in existence at all times since December 31, 1950, 26 U.S.C. § 1402(g)(1)(E). The legislative history mentions, as an example, the practices and beliefs of the Old Order Amish. *H.R.Rep.*

No. 89–213, 89th Cong., 1st Sess. 102 (1965), U.S.Code Cong. & Admin.News 1965, 305, 311.[26]

In *Lee,* the Supreme Court noted that the exemption covered only self-employed individuals and not employers or employees. The Court went on to find that the government's interest in assuring mandatory participation in a comprehensive national social security system was very high, and that the Amish religious belief afforded no basis for resisting the Social Security tax. The Court stated: "The tax imposed on employers to support the social security system must be uniformly applicable to all, except as Congress provides explicitly otherwise." 455 U.S. at 261, 102 S.Ct. at 1057.

The Supreme Court explicitly declined, however, to determine whether the exemption would have conflicted with the Establishment Clause if it had included within its ambit religious employers and employees, 455 U.S. at 261 n. 11, 102 S.Ct. at 1057 n. 11. It also did not address the restriction that the religious group providing the alternative welfare system be formed before 1951. While other courts have found Section 1402(g), or more often portions of it, constitutional, the exemptions at issue here are narrower. This Court cannot avoid the use of strict scrutiny here, as other courts have done with Section 1402(g), and cannot avoid the lack of neutrality present in the exemptions.[27]

---

**26.** Under the Medicare and Medicaid Acts, the nature of the exemptions is a bit different. Instead of allowing wholesale exclusion from the programs, Christian Science adherents must pay their full measure of Medicare and Medicaid taxes. However, they are then allowed to visit Christian Science sanitoria, where the programs will pay for certain services. Section 1402(g) provides that a qualified person may pay no Social Security taxes but, as a consequence, must give up all claims to Social Security benefits.

**27.** Circuit courts of appeals have examined Section 1402(g) in connection with the Establishment Clause; however, none has applied strict scrutiny. In *Jaggard v. Commissioner of Internal Revenue,* 582 F.2d 1189 (8th Cir.1979), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1228, 59 L.Ed.2d 462 (1979) and *Droz v. Commissioner of I.R.S.,* 48 F.3d 1120, 1124–25 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 656 (1996), Section 1402(g)'s requirement that

the individual belong to a religious group was upheld against an Establishment Clause challenge. However, the courts did not address any other requirements for the exemption. The *Droz* court explicitly declined to apply *Larson* since, looking at only the group requirement of the exemption, it did not discriminate among religions or promote some religions over others. *Id.* at 1124, 1125 n. 6. The court noted, however, that preserving the integrity of the Social Security system and ensuring that all persons were covered by a welfare plan were compelling interests, and that limiting the exemption to religious groups with their own welfare system was narrowly tailored to meet that interest.

The Third Circuit in *Bethel Baptist Church v. United States,* 822 F.2d 1334 (3d Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988), found the entirety of Section 1402(g) constitutional. The court found that Section 1402(g), as well as Section 1402(e) (which ex-

### B. Plaintiffs Have Standing to Raise Such a Claim

The Church claims that Plaintiffs lack standing to bring, and this Court lacks the authority to determine, the merits of the argument that other similarly situated groups have been or will be denied equal treatment, because Plaintiffs are admittedly not members of similarly situated groups. More specifically, the Church contends that Plaintiffs' speculation that other religions may not be accommodated as the Christian Scientists have been is inadequate to grant taxpayer standing. Mem. in Supp. of Def.–Intervenor 28 n. 9 (citing *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). The Church argues that since Plaintiffs are not part of a similar situated group which is unequally treated by the exemptions, this hypothetical situation may not be addressed.[28]

The Church does not consider the narrow exception for taxpayer standing concerning challenges of certain government expenditures under the Establishment Clause. In *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Court held that federal taxpayers have standing to raise Establishment Clause claims against certain exercises of congressional power. The *Flast* Court found standing in cases where the

taxpayer could prove two things: 1) the allegedly unconstitutional action has been taken under the Taxing and Spending Clause; and 2) the challenged action has exceeded a specific constitutional limitation upon the taxing and spending power. Although the *Flast* exception to the rule against taxpayer standing has been greatly limited, it still has force in challenges brought under the Establishment Clause.[29] In *Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), a case upon which all parties rely, the Court affirmed the *Flast* exception in an Establishment Clause challenge to grants made under the Adolescent Family Life Act ("AFLA"). The Court encountered no difficulty in finding that the plaintiff had authority to challenge the AFLA on its face:

> In *Flast v. Cohen,* ... we held that federal taxpayers have stating to raise Establishment Clause claims against exercises of congressional power under the taxing and spending power of Article I, § 8, of the Constitution. Although we have considered the problem of standing and Article III limitations on federal jurisdiction many times since then, we have consistently adhered to *Flast* and the narrow exception it created to the general rule against taxpayer standing established in *Frothingham v.*

empts ministers, members of religious orders, and Christian Science practitioners from social security taxation), were both based on secular considerations and were rational accommodations. The secular concerns behind the exemptions were held to be the integrity of the social security system, which were perhaps "compelling," and Congress' "overly cautious" conclusion that not passing the Section 1402(e) exemption would raise free exercise problems. *Id.* at 1341–42 & n. 10. The court found that the "rationality" standard, instead of the "compelling interest" standard, should be applied, because the distinction was based on secular concerns. *Id.* at 1341–42 (citing *Gillette v. United States,* 401 U.S. 437, 452, 91 S.Ct. 828, 837, 28 L.Ed.2d 168 (1971)). The *Gillette* Court noted, however, that the provision at issue in that case required "no particular sectarian affiliation or theological position," giving it no occasion to determine the outcome when "Congress grants a benefit expressly to adherents of one *religion.*" 401 U.S. at 450–51, 91 S.Ct. at 836–37 (emphasis in original). Since this case does involve a benefit to adherents of one religion, and *Larson* requires strict scrutiny in such a case, *Bethel Baptist Church* is of limited aid.

This Court does not have the luxury of finding a lack of discrimination between sects, as it is apparent on the face of the Acts. In that respect, this Court faces a different question, and cannot rely on these interpretations of Section 1402(g).

**28.** The Court is cognizant of the judicial duty to avoid declaring a statute unconstitutional if at all possible. *See, e.g., Rescue Army v. Municipal Court,* 331 U.S. 549, 568–74, 67 S.Ct. 1409, 1419–22, 91 L.Ed. 1666 (1947). Yet the Court cannot decline to decide issues properly before it: Plaintiffs have referenced this argument in their papers and at oral argument.

**29.** The case of *Allen v. Wright,* cited by the Church in support of its argument, did not involve an Establishment Clause challenge but rather a charge of race discrimination. The Court held that parents of black children attending public schools in districts undergoing desegregation did not have standing to require judicial review of the sufficiency of Internal Revenue Service standards denying tax-exempt status to racially discriminatory private schools. Notably, the case was decided three years before *Bowen.*

*Mellon* [262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078] [ (1923) ],.... Accordingly, in this case there is no dispute that appellees have standing to raise their challenge to the AFLA on its face.

487 U.S. at 618, 108 S.Ct. at 2579 (citations omitted).

The Court also found no impediment to standing was created by the involvement of an executive agency in disbursing the funds, in language that is directly relevant here:

> In subsequent cases, most notably *Tilton*, we have not questioned the standing of taxpayer plaintiffs to raise Establishment Clause challenges, even when their claims raised questions about the administratively made grants.... The AFLA is at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers, and appellees' claims call into question how the funds authorized by Congress are being disbursed pursuant to the AFLA's statutory mandate. In this litigation there is thus a sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of taxing and spending power, notwithstanding the role the Secretary plays in administering the statute.

487 U.S. at 619–20, 108 S.Ct. at 2579–80 (footnote omitted).

■ There can be little question that the Medicare and Medicaid Acts are programs of disbursement of funds pursuant to Congress' taxing and spending power; indeed, the Church admits as much in its Answer.[30] There can also be little question that this claim is brought under the Establishment Clause, even though it implicates equal protection concerns. The requirement of neutrality in the Establishment Clause, which is squarely at issue here, "in its application requires an equal protection mode of analysis." *Olsen,* 878 F.2d at 1463 n. 5 (quoting *Walz,* 397 U.S. at 696, 90 S.Ct. at 1425 (opinion of Harlan, J.)).

Even without reliance on *Flast,* the Church's standing argument fails. While it

articulates the dissenters' position in *Kiryas Joel,* it is directly opposite to the contention of the majority, which this Court is obligated to follow. The majority stated:

> The dissent protests it is novel to insist "up front" that a statute not tailor its benefits to apply only to one religious group ... but if this were so, *Texas Monthly, Inc.* would have turned out differently ... and language in *Walz* ... and *Bowen* ... purporting to rely on the breadth of the statutory schemes would have been mere surplusage. Indeed, under the dissent's theory, if New York were to pass a law providing school buses only for children attending Christian day schools, we would be constrained to uphold the statute against Establishment Clause attack until faced by a request from a non-Christian family for equal treatment under the patently unequal law.

512 U.S. at ——, 114 S.Ct. at 2494 (citations omitted). Thus, the Court need not, and should not, wait for such a plaintiff in order to determine whether the exemptions here violate the Establishment Clause in this manner.

**C. Cases Cited by Defendants and the Church are Distinguishable**

Defendants and the Church cite a variety of cases where the Court allowed direct grants of funds to be given to health care providers sponsored and operated by religious bodies, even by sectarian institutions. None of these cases condones the sect-specific exemptions at issue here. In *Bradfield v. Roberts,* 175 U.S. 291, 297–99, 20 S.Ct. 121, 123–24, 44 L.Ed. 168 (1899), the Supreme Court approved the specific appropriation by Congress of money to a hospital which would likely be "conducted under the auspices of the Roman Catholic Church." The Court emphasized at length, however, that the hospital was formed under an act of incorporation which did not even mention religion of any kind:

> Nothing is said about religion or about the religious faith of the incorporators of this institution in the act of incorporation....

---

**30.** The Church admits, as it must, that Medicaid and Medicare payments to Christian Science sanitoria are derived from taxes "levied by the Unit-

ed States and spent by the United States." Answer of the First Church of Christ, Scientist ¶¶ 36, 69.

The facts above stated do not in the least change the legal character of the hospital, or make a religious corporation out of a purely secular one as constituted by the law of its being. . . . That the influence of any particular church may be powerful over the members of a nonsectarian and secular corporation, incorporated for a certain defined purpose and with clearly stated powers, is surely not sufficient to convert such a corporation into a religious or sectarian body. . . . There is no allegation that its hospital work is confined to members of that church or that in its management the hospital has been conducted so as to violate its charter in the smallest degree. . . . The charter itself does not limit the exercise of its corporate powers to the members of any particular religious denomination, but, on the contrary, those powers are to be exercised in favor of anyone seeking the ministrations of that kind of an institution. . . . Its property is to be acquired in its own name and for its own purposes; *that property and its business are to be managed in its own way, subject to no visitation, supervision, or control by any ecclesiastical authority whatever, but only to that of the government which created it.*

175 U.S. at 297–99, 20 S.Ct. at 123–24 (emphasis added).

Here, of course, there is no dispute that the Church controls, to a large extent, the operation of the sanitoria. The secular charter in *Bradfield* showed "there is nothing sectarian in the corporation." The exemptions just as clearly demonstrate the sectarian character of the sanitoria, and that the Church is explicitly allowed to exercise its "ecclesiastical authority" over these institutions. This is not to say that allowing the Church the power to certify which sanitoria practice Christian Science medicine is an impermissible delegation of governmental authority, but only to emphasize that *Bradfield* cannot be extended to reach the present situation.

Defendants and the Church also cite a number of cases where health care benefits

were allowed to flow to sectarian institutions. But an examination of the statutes at issue in those cases shows that the laws did not distinguish between sects, nor even between religious and non-religious institutions. The generic nature of these programs was emphasized in *Bowen v. Kendrick*, 487 U.S. 589, 608, 108 S.Ct. 2562, 2573, 101 L.Ed.2d 520 (1988), where the contested statute was facially neutral "with respect to the grantee's status as a sectarian or purely secular institution." *Id.* The Supreme Court specifically found that "nothing on the face of the [statute] indicates that a significant proportion of the federal funds will be disbursed to 'pervasively sectarian' institutions"—the "possibility" that some proportion of funds provided by the statute would go to such institutions was not sufficient to invalidate the statute on its face. 487 U.S. at 611, 108 S.Ct. at 2575. This principle was reaffirmed in *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8, 113 S.Ct. 2462, 2466, 125 L.Ed.2d 1 (1993): "we have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit."

On their faces, these programs are not neutral, and a portion of those institutions which receive benefits are defined with explicit reference to their religion. The authority cited by Defendants and the Church must be distinguished on that ground. *Cf. Mueller v. Allen*, 463 U.S. 388, 398–99, 103 S.Ct. 3062, 3069, 77 L.Ed.2d 721 (1983) ("[A] program . . . that neutrally provides state assistance to a broad spectrum of citizens is not readily subject to challenge under the Establishment Clause."); *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (statute which authorized funding for nonpublic schools, both sectarian and nonsectarian, was constitutional as to books, diagnostic services, and remedial and therapeutic services, but unconstitutional as to instructional materials and equipment and field trip services); [31]

---

**31.** In *Wolman*, a case relied upon heavily by the Church and Defendants, the Court found that its

previous decisions "contain a common thread to the effect that the provision of health services to

*Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (state statute authorizing payment of state funds to colleges and universities in general, providing that no funds "shall be utilized by the institutions for sectarian purposes," was constitutional); *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) (statute forming Authority for construction and financing of educational facilities, which excluded "any facility used or to be used for sectarian instruction or as a place of religious worship nor any facility which is used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomination," was constitutional in light of lack of evidence that facilities were pervasively sectarian); *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (grants made under Higher Education Facilities Act of 1963 to church-related colleges were constitutional, but provision limiting recipients' obligation not to use federally financed facilities for sectarian purposes for twenty years struck down, as 20-year provision would allow federal funds to advance religion after that period).

The sect-specific distinctions made in the exemptions "cross[ ] the line from permissible accommodation to impermissible establishment." *Kiryas Joel,* 512 U.S. at ——, 114 S.Ct. at 2494. In doing so, the Court does not blind itself to the evident problem of Christian Scientists having to pay Medicare and Medicaid taxes while not receiving the benefits of these programs at Christian Science sanitoria. Yet the accommodation as drawn smacks of religious favoritism which cannot be countenanced under the Establishment Clause.

The governmental interest in providing basic care and services to all eligible citizens is a compelling one. The Christian Scientists are not receiving benefits which are unavailable to outsiders—other recipients of Medicaid and Medicare are aided by government payment for bed and board, and for nursing services and supplies.[32] They are receiving these benefits, however, by virtue of acts of the federal government which apply to only one religious group. Legislative accommodation of religious beliefs is a valuable and worthy enterprise, but here, applying Supreme Court precedent, the accommodation has gone too far, and too strongly favors the convictions of one particular sect. The Court does not doubt that Christian Scientists enjoy the largest and most prominent network of religiously-based alternative care institutions in the country. But to bestow a benefit upon *only* these particular institutions does not comport with the basic constitutional requirement of neutrality among religions.

## V. The Requested Relief

The Court is fully aware of the impact of its ruling. Exemptions on which Christian Scientists and the Church have relied for more than twenty-five years have been determined to be invalid. The consequences for past, current, and future patients at Christian Science sanitoria may be substantial, and the impact on the Church may be formidable. Yet these considerations are not properly part of this Court's constitutional analysis. The fact that this practice may be long-standing does not convert an unconstitutional practice into a constitutional one.

Plaintiffs request injunctive relief designed to prevent use of the exemptions to determine eligibility for Medicare and Medicaid benefits, and designed to prevent payment of benefits based on the exemptions. Plaintiffs are entitled to such relief. Yet given the potential impact such an injunction would generate, and the certainty of an appeal, the

---

all schoolchildren—public and nonpublic—does not have the primary effect of aiding religion." 433 U.S. at 242, 97 S.Ct. at 2602. The Court quoted *Lemon* for the proposition that the provision of public health serviced "in common to all students" was "not thought to offend the Establishment Clause." *Id.* (quoting *Lemon,* 403 U.S. at 616–17, 91 S.Ct. at 2113). The exemptions, however, afford Christian Scientists the option of treatment at religiously-affiliated institutions which do not have to follow the normal rules applicable to other institutions such as Lutheran or Catholic hospitals or nursing homes. In other words, the health services are not provided "in common" with the rest of the American citizenry.

**32.** *See* Ault Decl. ¶ 7; *HCFA Christian Science Supplement* §§ CS–200(D); 204(A).

Court will suspend such injunctive relief. *See* Fed.R.Civ.P. 62(c).

### Conclusion

Accordingly, based on the foregoing, and all of the records, files, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 25) is **DENIED,** that Defendant–Intervenor First Church of Christ, Scientist's Motion for Summary Judgment (Doc. No. 28) is **DENIED,** and that Plaintiffs' Motion for Summary Judgment (Doc. No. 3) is **GRANTED. IT IS FURTHER ORDERED** that the following fifteen regulatory and statutory provisions **ARE HEREBY DECLARED UNCONSTITUTIONAL, INVALID, AND UNENFORCEABLE.**

The affected statutory provisions are:

1) That portion of 42 U.S.C. § 1395x(e) which provides:

> The term "hospital" also includes a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts, but only with respect to items and services ordinarily furnished by such institution to inpatients, and payment may be made with respect to services provided by or in such an institution only to such extent and under such conditions, limitations, and requirements (in addition to or in lieu of the conditions, limitations, and requirements otherwise applicable) as may be provided in regulations.

2) That portion of 42 U.S.C. § 1395x(y)(1) which provides:

> The term "skilled nursing facility" also includes a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts, but only with respect to items and services ordinarily furnished by such an institution to inpatients, and payment may be made with respect to services provided by or in such an institution only to such extent and under such conditions, limitations, and requirements (in addition to or in lieu of the conditions, limitations, and requirements otherwise applicable) as may be provided in regulations.

3) 42 U.S.C. § 1320c–11, providing: "The provisions of this part shall not apply with respect to a Christian Science sanitorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts."

4) That portion of 42 U.S.C. § 1396a(a) which provides: "The provisions of paragraphs (9)(A), (31), and (33) and of section 1396b(i)(4) of this title shall not apply to a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts."

5) That portion of 42 U.S.C. § 1396g(e)(1) which provides that the definition of "nursing home" "does not include a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts."

The affected regulatory provisions are:

1) That portion of 42 C.F.R. § 466.1 which defines "hospital" to mean a health care institution "other than a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts."

2) That portion of 42 C.F.R. § 431.610(b) which provides: "The requirement for establishing and maintaining standards does not apply with respect to Christian Science sanitoria operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Mass."

3) That portion of 42 C.F.R. § 440.155(b)(1) which provides that "nursing facility services" include services "[c]onsidered appropriate by the State and provided by a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Mass."

4) 42 C.F.R. § 440.170(b), providing:

> *Services of Christian Science nurses.* "Services of Christian Science nurses" mean services provided by nurses who are listed and certified by the First Church of Christ, Scientist, Boston, Mass., if—
>
> (1) The services have been requested by the recipient; and
>
> (2) The services are provided—

(i) By or under the supervision of a Christian Science visiting nurse organization listed and certified by the First Church of Christ, Scientist, Boston, Mass.;

(ii) As private duty services to a recipient in his own home or in a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Mass., if the recipient requires individual and continuous care beyond that available from a visiting nurse or that routinely provided by the nursing staff of the sanatorium.

5) 42 C.F.R. § 440.170(c), providing:

*Services in Christian Science sanatoriums.* "Services in Christian Science sanatoriums" means services provided in Christian Science sanatoriums that are operated by, or listed and certified by, the First Church of Christ, Scientist, Boston, Mass.

6) 42 C.F.R. § 442.12(b), providing:

*Exception.* The certification requirement of paragraph (a) of this section does not apply with respect to Christian Science sanitoria operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Mass.

7) That portion of 42 C.F.R. § 456.251, in defining "skilled nursing facility services," which "excludes those services if they are provided in Christian Science sanitoria."

8) That portion of 42 C.F.R. § 456.351, in defining "intermediate care facility services," which "excludes those services if they are provided in Christian Science sanitoria."

9) That portion of 42 C.F.R. § 456.601, in defining "intermediate care facility," which "excludes Christian Science sanatoria operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Mass."

10) That portion of 42 C.F.R. § 431.701, in defining "nursing home," which states that the term does not include "(a) A Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Mass."

Defendants are **ENJOINED** from using of the foregoing provisions to determine eligibility for benefits, and from paying benefits based on the exemptions; however, this in-junctive relief is **STAYED** until the time for appealing from this Memorandum Opinion and Order has expired, and if an appeal is taken from this Memorandum Opinion and Order, the stay will be continued throughout the pendency of the appeal.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**