LAY, Circuit Judge,
dissenting.
I respectfully dissent.
The basic deficiency of the majority opinion is that it upholds the constitutionality of a statute which provides a government benefit solely to religious institutions and their adherents. I am aware of no other decision in the United States which has upheld such a program. As the Supreme Court observed in Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 710, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985):
This unyielding weighting in favor of [a particular faith] over all other interests contravenes a fundamental principle of the Religion Clauses, so well articulated by Judge Learned Hand:
“The First Amendment ... gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities.”
(citation omitted).
The fundamental principle underlying the First Amendment’s Establishment Clause is government neutrality toward religion. See Everson v. Board of Educ., 330 U.S. 1, 15, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (government should not “pass laws which aid one religion, aid all religions, or prefer one religion over another.”). While the Medicare and Medicaid provisions at issue are veiled in textual neutrality, it is well-settled that facial neutrality of a law is not dispositive; rather, a court must examine a law’s form and effect. See Church of the Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (striking down ordinances which targeted the religious activity of animal sacrifice practiced by the Santería religion). When the form and effect of the Medicare and Medicaid provisions are examined, it becomes clear that *1101 they are an abandonment of the fundamental principle of neutrality and merely serve to replicate the unconstitutional provisions struck down in Children’s Healthcare is a Legal Duty, Inc. v. Vladeck, 938 F.Supp. 1466 (D.Minn.1996) (CHILD I).
In the face of an Establishment Clause challenge'there are two possible tests:. 1) the three-prong test announced in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)[9]; and 2) the stricter standard of review articulated in Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), for laws which facially discriminate among religions. The Medicare and Medicaid provisions at issue exhibit denominational preference such that strict scrutiny is required; regardless, even if one accepts the majority’s position that Larson is inapplicable, the statutes are unconstitutional under Lemon.
I. STRICT SCRUTINY
In Larson, the Court stated that “when we are presented with a ... law granting a denominational preference, our precedents demand that we treat the law as suspect.and that we apply strict scrutiny in adjudging its constitutionality.” 456 U.S. at 246, 102 S.Ct. 1673. Under Larson, a law that makes explicit and deliberate distinctions between religious organizations must be closely fit to the furtherance of a compelling government interest. See id. at 246-47, 102 S.Ct. 1673. Critically, the law at issue in Larson did not name any particular religious group. The Court looked beyond this, however, and examined the law’s intent and legislative history and found it demonstrated a denominational preference for older, more established churches. See id. at 255, 102 S.Ct. 1673. Thus, a law can “facially discriminate” among religions even when it does not expressly distinguish by sect name. To determine whether strict scrutiny applies, a court looks at a law’s text, legislative history, and real operation. See Church of the Lukumi Babalu Aye, 508 U.S. at 533-35, 113 S.Ct. 2217.
The majority errs in holding that the provisions here do not reveal facial differentiation of religious sects. Admittedly, the Medicare and Medicaid provisions do not specifically name any religious sect; however, every other indicator reveals that these provisions are far from neutral and that they have as their object a denominational preference for Christian Scientists.
A. Legislative History of Section 4454
From their very inception, the Medicare and Medicaid provisions have re- *1102 fleeted explicit and deliberate distinctions among religions. On August 7, 1996, the United States District Court for the District of Minnesota held unconstitutional those portions of the Medicare and Medicaid statutes and regulations which specifically directed benefits to “Christian Science sanitoria.” See CHILD I, 938 F.Supp. 1466. In direct response to this, Senator Orrin Hatch proposed an amendment to the law entitled “Christian Science Sanitoria.” (App. at 108.) This amendment stated that, as a result of' CHILD I, “unless [Medicare/Medicaid] is changed, large numbers of Christian Scientists who have paid into Medicare for over 30 years will be denied access to the benefits they reasonably expected for care provided in Christian Science nursing care facilities.” (Id.) Thus, it is clear that the sole impetus for the present law was the alleged plight of Christian Scientists.
The Senate Finance Committee approved Senator Hatch’s amendment, and the proposal was eventually embodied in section 4464 of the Balanced Budget Act of 1997 (section 4464). Section 4464 substituted the words “religious nonmedical health care institution” (RNHCI) for each reference to “Christian Science sanatorium” which had been struck by CHILD I. During the debate on the Balanced Budget Act of 1997, Senator Kennedy spoke in favor of section 4454, stating:
When Medicaid and Medicare were enacted over 30 years ago, Congress included a special provision granting a religious accommodation for members of the church ....
For 30 years, the Christian Science Church relied on Medicare and Medicaid benefits and built a health care system that assists thousands of men and women.
This [amendment] meets the worthwhile goals of the original Medicare and Medicaid laws, while meeting constitutional concerns. It deserves to be enacted into law so that the needed benefits will continue to be available.
143 Cong. Rec. S6301-02, S6321-22 (daily ed. June 25,1997) (emphasis added).
On July 31, 1997, Senator Hatch, discussing section 4454, expressed concern over the recent decision in CHILD I, and stated:
Mr. President, I would like to turn now to another provision, the need for which was brought to my attention by Ms. Michelle Newport, a Christian Scientist in Salt Lake City, UT.
Under several provisions of Medicare and Medicaid law, reimbursement has been authorized for literally decades for nonmedical hospital and skilled nursing facility services provided in sanitoria operated by the First Church of Christ, Scientist.
143 Cong. Rec. S8415-01, S8447 (daily ed. July 31,1997).
Additionally, the House Conference Report on section 4454 reveals Congress’ interest in “continuing” benefits to Christian Scientists. The Report provides:
The conference agreement continues the provision of needed nonmedical nursing services to poor and elderly Americans who have contributed to the Medicare and Medicaid systems, without requiring them to violate their sincerely held religious beliefs.... The conference agreement replaces [the provisions struck down in Child /] with a sect-neutral accommodation available to any person who is relying on a religious method of healing and for whom the acceptance of medical health services would be inconsistent with his or her religious beliefs....
[The agreement] avoids the unfairness of requiring these Americans to pay taxes ... for years without being able to receive any benefits. The Conferees believe it would be particularly harsh to cut off nursing benefits for poor and elderly men and women who have not *1103 made alternative arrangements for financing their health care and who now rely on the availability of nonmedical nursing benefits at a time when other patients receive reimbursement for hospital care.
H.R. Conf. Rep. 105-217 (emphasis added).
Admittedly, the legislative history of section 4454 includes some language implying an intent to accommodate a broad class of religious objectors. The majority relies on this apparent breadth and finds the legislative history demonstrates an intent to benefit all persons “who embrace spiritual healing over medical treatment” and reveals no evidence of an intent to include only Christian Scientists. Such conclusion ignores the clear theme underlying every aspect of the legislative history — Congress sought to “continue” the benefits that previously existed. Those prior benefits were specifically and solely directed to Christian Scientists. In essence, Congress designed section 4454 to fit precisely into the gap left by CHILD I. In 1997, Congress’ approach to providing these benefits was certainly more sophisticated than the original provisions; however, “[t]he Constitution ‘nullifies sophisticated as well as simple-minded modes’ of infringing on Constitutional protections.” U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 829, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (quoting Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939)).
The legislative history in this case reveals a specific intent to solely benefit Christian Scientists. Congress’ incredibly narrow crafting of the new provisions leaves no doubt regarding their lack of neutrality and denominational preference for Christian Scientists.
B. The Actual Effect of Section 4454
As the Supreme Court has observed, further evidence of a law’s object can be found by analyzing its actual effect. See id. at 535, 113 S.Ct. 2217 (“[a]part from the text, the effect of a law in its real operation is strong evidence of its object.”) In practice, the statutes at issue encompass only Christian Science sanatoria. Under 42 U.S.C. § 1395x(ss)(l)(C), RNHCI benefits must be received in an institution that provides “only nonmedical nursing items and services exclusively to patients who choose to rely solely upon a religious method of healing and for whom the acceptance of medical health services would be inconsistent -with their religious beliefs.” Further, 42 U.S.C. §§ 1395x(ss)(l)(D) and (G) exclude from the definition of RNHCI institutions that employ medical personnel or that affiliate with medical organizations. Despite the breadth of this language, no party has been able to point to any group beyond Christian Science sanitoria that presently qualify under the RNHCI provisions. Thus, the real operation of section 4454 continues to select only Christian Science sanatoria for a special benefit.
The actual effect of section 4454 closely parallels that of Chapter 390 in Grumet v. Pataki, 93 N.Y.2d 677, 697 N.Y.S.2d 846, 720 N.E.2d 66 (1999), cert. denied, — U.S. —, 120 S.Ct. 363, 145 L.Ed.2d 284 (1999) (Kiryas Joel III). In Kiryas Joel III, the New York Legislature’ attempted, for the third time, to establish a public school district for the benefit of disabled children in the Village of Kiryas Joel. Village residents strictly adhere to Satmar Hasidism. The latest incarnation of the school district law used wholly secular language; the court, however, found “[a]l-though chapter 390 sets forth facially neutral criteria, any attempt to characterize the statute as a religion-neutral law of general applicability is belied by its actual effect.” Id. at 72. The actual effect of Chapter 390 allowed the Village of Kiryas Joel and only one other municipality to benefit. The court found that Chapter 390 was crafted “in such a way that permits the statute’s benefits to flow almost exclusively to the religious sect it was plainly designed to aid.” Id. at 73. The same must be said of section 4454.
*1104 The majority does not contest the idea that only Christian Science sanatoria qualify as RNHCIs. The majority argues, however, that “a claimant alleging ‘gerrymander’ must be able to show the absence of a neutral, secular basis for the lines government has drawn.” Gillette v. United States, 401 U.S. 437, 452, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) (finding exemption from draft for conscientious objectors had valid, neutral reasons for limitation to objectors of “war in any form”). The majority then identifies the criteria for RNHCIs and articulates possible secular purposes for each criterion. While each aspect of the new law may appear to be neutral when taken independently, as a whole it is clear that section 4454 only identifies Christian Science sanatoria. The neutrality of the words in isolation cannot camouflage the lack of neutrality of the whole. It is apparent that the definition and qualifying criteria, though not entirely devoid of secular bases, are drawn to benefit a single sect.
Additionally, appellees argue that the fact that no one else presently qualifies is not evidence of section 4454’s lack of neutrality. I disagree. That only one religious organization can currently be identified accentuates the suggestion that the criteria were carefully and tightly drawn with an intent to solely benefit Christian Scientists.
Thus, section 4454’s legislative history and its actual effect point to its underlying denominational preference. In light of this, this court should have analyzed the statutes under Larson’s rule of strict scrutiny. In so doing, the law, on its face, demonstrates there exists no compelling interest in providing special benefits to adherents of a particular religious sect. Thus, I would hold section 4454 to be unconstitutional.
II. LEMON ANALYSIS
Assuming, arguendo, that Larson does not apply, section 4454 still fails under Lemon. In Lemon, the Court established a three-prong analysis: a law must 1) have a secular purpose; 2) have a primary effect that neither advances nor inhibits religion; and 3) avoid excessive government entanglement with religion. 403 U.S. at 612-13, 91 S.Ct. 2105.
A. Secular Purpose
To satisfy the first prong of Lemon, a statute must have a secular purpose. As was noted above, the legislative history of section 4454 reveals a purpose to “continue” the benefits previously provided to Christian Scientists, or, if one accepts the majority’s interpretation, the legislative history reveals an intent to benefit all religious objectors to medical care. In either case, such purpose is not secular. The Supreme Court has recognized, however, that accommodation of religion, i.e. the alleviation of significant governmental interference with the exercise of religion, can constitute a permissive secular purpose. See Corp. of the Presiding Bishop v. Amos, 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (upholding application of religious exemption to Title VII’s prohibition of religious discrimination in employment). Critically, however, while there can be constitutionally permissive accommodations beyond what is required by the Constitution, “accommodation is not a principle without limits.” Board of Educ. of Kiryas Joel Village Sch. Dish v. Grumet, 512 U.S. 687, 706, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (Kiryas Joel I) (concluding that singling out the Kiryas Joel community for special treatment violated the principle of neutrality to which all accommodations must adhere). As Judge Murphy eloquently noted: “[a]n asserted motivation of religious accommodation ... cannot shield governmental actions that otherwise violate the principle of neutrality embedded in the establishment clause.” Stark v. Independent Sch. Dist., No. 640, 123 F.3d 1068, 1079 (8th Cir.1997) (Murphy, J. dissenting), cert. denied, 523 U.S. 1094, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998). Despite Judge Murphy’s wise *1105 counsel, today’s majority seems to allow the rallying-cry of “accommodation” to rule the day.
The majority holds that section 4454 properly accommodates religion. As the starting point for its accommodation analysis, the majority relies on Sherbert v. Verner, 374 U.S. 398, 399 n. 1, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (reversing denial of benefits to Sabbatarian who refused to work on Saturday after noting there is no “doubt that the prohibition against Saturday labor is a basic tenet of the Seventh-day Adventist creed, based upon that religion’s interpretation of the Holy Bible”), and Thomas v. Review Bd. of the Indiana Employment Sec. Div., 450 U.S. 707, 716, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (reversing denial of unemployment benefits to Jehovah’s Witness who refused to make military equipment, noting that “petitioner terminated his work because of an honest conviction that such work was forbidden by his religion.”). The majority states section 4454 removes “a special burden imposed by the Medicare and Medicaid Acts upon persons who hold religious objections to medical care.” The majority contends that without section 4454, individuals who object to medical care are burdened because they are forced to choose between adhering to their religious beliefs and foregoing health care, or violating their beliefs and receiving care. The majority then concludes this “burden” is comparable to that of Sherbert and Thomas and justifies an accommodation.
The majority’s analysis is flawed in two ways. First, any “burden” present in this case is not of the kind that accommodation theory was designed to remedy. Second, even if a proper burden existed, the “accommodation” provided goes beyond what is constitutionally permissible and is instead an establishment of religion.
In Gillette, the Court upheld that section of the Military Selective Service Act exempting people conscientiously opposed to participation in war in any form. The Court stated that “ ‘[n]eutrality’ in matters of religion is not inconsistent with •‘benevolence’ by way of exemptions from .onerous duties ....” 401 U.S. at 454, 91 S.Ct. 828 (internal citations omitted) (emphasis added). In Amos, in the face of an Establishment Clause challenge, the Court upheld Section 702 of the Civil Rights Act of 1964, which allowed certain religious employers to discriminate on the basis of religion. The Court found this exemption had the purpose and effect of “alleviating significant governmental interference” with the exercise of religion. 483 U.S. at 339, 107 S.Ct. 2862 (emphasis added). These two cases present religious accommodation as a method of removing significant governmental burdens on the free exercise of religion. In contrast, the facts of the present case reveal that the statutory provisions at issue benefit, as opposed to, burden certain religious adherents.
The majority’s conclusion that a “burden” exists is based on a basic misunderstanding of Medicare and Medicaid. These programs form a framework through which government provides the secular benefit of medical care. The statutory scheme allows reimbursement for expenses for reasonable in-patient hospital expenses, post-hospital care services, and post-hospital home care expenses. Critically, Medicare and Medicaid do not cover all health care services, but only those that are “reasonable and necessary for the diagnosis or treatment of illness or injury ....” 42 U.S.C. § 1395y(a)(l)(A). Thus, reimbursement of personal nursing care is only allowed when it is an integral component of medical care. Without section 4454, religious objectors to medical care are denied reimbursement for nonmedical personal nursing care because they decline to accept the very benefit (medical care) for which any reimbursement of such care must be a part. This choice to decline a benefit is not a “burden.” As is stated in the opening of this dissent, no other decision has ever upheld government benefits solely because of religious belief. The majority fails to recognize the fundamental *1106 and significant difference between the affirmative award of government benefits to religious adherents and a government exemption designed to alleviate a burden.
The logic employed by the majority would allow nearly anything to be deemed a burden so as to permit an accommodation. For example, states fund public education. Religious individuals choose not to accept such education for religious reasons. The states’ funding of public education includes funds for textbooks which are integral to the process of public education. Under the majority’s reasoning, a religious group with an independent education system could assert that the states’ failure to pay for their tuition and textbooks is a burden such that a legislative accommodation would be permissible. Such logic is both strained and unconstitutional.
Even if a proper burden existed, section 4454 far exceeds a constitutionally permissible accommodation. While the Supreme Court has not specifically defined the test for evaluating accommodations, at minimum, an accommodation cannot benefit only particular religions or benefit all religions but not nonreligious organizations. In Estate of Thornton v. Caldor, the Court struck down a Connecticut statute which provided Sabbatarian employees with an absolute right not to work on their Sabbath without losing the right to their unemployment benefits. The Court found the law impermissibly gave Sabbatarians privileges that were not available to others who had legitimate but non-religious reasons for missing weekend work. See Caldor, 472 U.S. at 710 n. 9, 105 S.Ct. 2914. In Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989), Texas exempted religious periodicals from its sales tax. The Court observed that while it had previously upheld statutes which directed governmental benefits to religions, in those cases “the benefits derived by religious organizations flowed to a large number of nonreligious groups as well.” Id. at 11, 109 S.Ct. 890. The Court cautioned that it “would not have hesitated to strike them down for lacking a secular purpose and effect” if only certain religious organizations had benefitted. Id. The benefit at stake in section 4454 flows only to Christian Science sanatoria. As such, even if a burden existed, section 4454 violates the Court’s proscription against benefitting only certain religious organizations and, thus, cannot be a proper accommodation.
B. Primary Effect
Under Lemon, a statute cannot have as its primary effect the advancement or inhibition of religion. This effects prong has been interpreted to mean that government action cannot have the effect of endorsing religion. In County of Allegheny v. ACLU, 492 U.S. 573, 592, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), the Court noted, “[i]n recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of ‘endorsing’ religion, a concern that has long had a place in our Establishment Clause jurisprudence.” In Texas Monthly, focusing on the breadth of the benefitted class, the plurality stated:
when government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbene-ficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion ... it “provide[s] unjustifiable awards of assistance to religious organizations” and cannot but “eonve[y] a message of endorsement” to slighted members of the community.
Texas Monthly, 489 U.S. at 14, 109 S.Ct. 890 (quoting Amos, 483 U.S. at 348, 107 S.Ct. 2862 (O’Connor, J. concurring)). Thus, statutes are an unconstitutional endorsement of religion when they provide a benefit to one community that is not equally provided to others. See Kiryas Joel I, 512 U.S. at 703-04, 114 S.Ct. 2481. Section 4454 does just this.
*1107 Medicare expressly excludes reimbursement for “custodial care.” 42 U.S.C. § 1395y(a)(9). Custodial care is defined as “any care that does not meet the requirements for coverage as [skilled nursing] care ....”42 C.F.R. 411.15(g). “Skilled nursing” care is defined as services that are ordered by a physician, require the skills of technical or professional personnel, and are furnished by or under the supervision of such personnel or physician. See 42 C.F.R. 409.31. Further, the regulations of “skilled nursing facilities” provide that, to be considered a skilled service, it “must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel.” 42 C.F.R. § 409.32(a). Personal care services, such as administration of routine oral medication, eye' drops, ointments, changing dressings, and routine care of incontinent patients, are generally not skilled services and are excluded from reimbursement under the “custodial care” exception. See 42 C.F.R. § 409.33(d).
An RNHCI is defined in 42 U.S.C. § 1395x(ss)(l) as an institution that provides only nonmedical nursing items and services exclusively to religious medical objectors practicing religious healing and uses only nonmedical personnel. Further, an RNHCI, by definition, has institutional religious beliefs against providing medical care, examination, diagnosis, prognosis, or treatment, and can have no affiliation with medical providers. See id.
Under the very definition provided, it is readily apparent that the services provided in an RNHCI cannot meet the requirements for skilled nursing services and are instead custodial services. .-Consequently, such care should be excluded from reimbursement. By giving benefits to certain religious groups which are unavailable to others, section 4454 unconstitutionally places the imprimatur of government on the Christian Science faith.[10]
The majority does not dispute that'the care provided in RNHCIs fits within the definition of “custodial care.” Rather, the majority tries to distinguish RNHCI care from mere custodial care by noting that 42 U.S.C. § 1395i — 5(a)(2) provides that payments are made for services furnished to an individual in an RNHCI only if “the individual has a condition such that the individual would qualify for benefits ... if the individual were an inpatient or resident in a hospital or skilled nursing facility that was not an [RNHCI].” The majority asserts that this provision ensures that an RNHCI patient will only be reimbursed if his or her illness is such' that he would have received skilled care in a medical institution and thus, such patient is not receiving anything “special” but is instead receiving merely a “subset” of benefits.[11]
The majority’s reasoning defies sensibility. To assert that RNHCI benefits are a “subset” of medical benefits is a categorical error. The entire nature of Medicare and Medicaid is to provide medical ser *1108 vices in a manner managed by medical criteria and qualifications and governed by the medical profession. RNHCIs and the care they provide are, by definition, “non-medical.” That which is defined as not being X cannot logically be a subset of X. Admittedly, certain “nonmedical” care is necessary for the furtherance of medical care; however, reimbursement for such nonmedical care was never intended to be a stand-alone benefit. Nonmedical aspects of care, such as room and board, are covered only as incidents of medical care. Allowing RNHCI’s to receive reimbursement for nonmedical services as a standalone benefit has the effect of endorsing religion.
The majority provides a hypothetical in the hopes of elucidating its argument; but the comparison provided is malapropos. The majority compares two patients, one in an RNHCI and one in a medical facility, and argues that they will always receive the same care with the patient in the medical facility merely receiving more care. The difficulty with this comparison is that it compares medical care to non-medical care. A more apt comparison is between those groups receiving standalone nonmedical services. RNHCI patients receive stand-alone nonmedical services and are reimbursed for them because of their specific religious beliefs; non-religious objectors and custodial care patients receive stand-alone nonmedical services and are not reimbursed for them because of their lack of specific religious beliefs. This comparison reveals that the receipt of stand-alone nonmedical benefits is a special benefit to a single religious group. As such, it violates the effects prong of Lemon.
C. Excessive Entanglement
The third prong of the Lemon analysis requires that a law not foster excessive entanglement of government and religion. In Larkin v. Grendel’s Den, Inc., 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), the Court struck down a Massachusetts statute granting religious bodies veto power over applications for liquor licenses. The Court held that the statute violated the neutrality principle in two ways: 1) by fusing governmental and religious functions through the delegation of important discretionary governmental powers to religious bodies; and 2) by lacking any effective guarantee that the delegated power would be used for secular, neutral purposes. See id. at 125-26, 103 S.Ct. 505. In Kiryas Joel I, the Court stated that the statute creating the Kiryas Joel school “depart[ed] from [the] constitutional command [of the Establishment Clause] by delegating the State’s discretionary authority over public schools to a group defined by its character as a religious community, in a legal and historical context that gives no assurance that governmental power has been or will be exercised neutrally.” Kiryas Joel I, 512 U.S. at 696, 114 S.Ct. 2481. In essence, the prohibition on excessive entanglement minimally means “a State may not delegate its civic authority to a group chosen according to a religious criterion.” Id. at 696-97, 114 S.Ct. 2481. See also Barghout v. Bureau of Kosher Meat and Food Control, 66 F.3d 1337, 1342 (4th Cir.1995) (striking an ordinance that made it a misdemeanor to offer for sale, food falsely labeled as kosher because the statute fostered excessive entanglement “by vesting significant investigative, interpretive, and enforcement power in a group of individuals based on their membership in a specific religious sect.”).
The statutory scheme at issue in this case violates this principle. The provisions allow the initial decision regarding medical necessity to be made at the RNHCI and initially reviewed by the RNHCI’s utilization review committee. Admittedly, the statutes purportedly vest final decision-making authority in the Secretary of Health and Human Services (Secretary). The majority relies on this “ultimate decision-making authority” to overcome any entanglement difficulties. There are, however, two pitfalls to the review provisions.
*1109 First, the initial decisions are made by individuals wholly opposed to medical care. In his dissent in Bowen v. Kendrick, 487 U.S. 589, 636, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), Justice Blackmun noted that, “asking religious organizations to teach and counsel youngsters on matters of deep religious significance, yet expecting] them to refrain from making reference to religion is both foolhardy and unconstitutional.” It is no less foolhardy to ask an individual opposed to medical care on a religious basis to make a medical determination without regard to religion. This case, however, presents an even more outrageous hypothesis. The Christian Science faith not only opposes medical care; it altogether denies the reality of pain and disease. See Mary Baker Eddy, Science And Health With Key To The Soriptures (1991). Thus, the statutes here delegate the initial “diagnosis” of medical status to untrained laypersons who deny the reality of medical need. This is beyond foolhardy.
Second, while the statutory scheme allows for administrative review ‘of the RNHCI’s initial determination, such review is constrained. For example, the statutes provide that the Secretary cannot require “any patient of [an RNHCI] to undergo medical screening, examination, diagnosis, prognosis, or treatment or to accept any other medical health care service, if such patient ... objects thereto on religious grounds,” 42 U.S.C. § 1395x(ss)(3)(A)(i), and the Secretary cannot subject an RNHCI or its personnel “to any medical supervision, regulation, or control, insofar as such supervision, regulation, or control would be contrary to [their] religious beliefs -” 42 U.S.C. § 1395x(ss)(3)(B)(i). The majority’s reliance on the umbrella provisions of 42 U.S.C. § 1395x(ss)(3)(A)(ii) and (B)(ii), which allow the Secretary to require “sufficient information” regarding an individual’s condition and to review such information to the extent necessary to determine coverage, is an Olympian leap of faith.[12] Saying both that you cannot require medical analysis and that, despite this, the Secretary can demand sufficient evidence to make a medical determination, seems insincere at best.
The review provided under the Medicare and Medicaid statutes is illusory. In effect, section 4454 vests significant interpretive governmental powers in a group based on their specific religious sect. Such delegation violates the third prong of Lemon.
III. CONCLUSION
Accommodation of religion can aid in negotiating the line between the twin First Amendment Clauses of Free Exercise and Establishment. However, accommodation is not a principle without limits. Section 4454 violates the fundamental principle of neutrality underlying the Establishment Clause and cannot stand as a permissive accommodation. Consequently, I respectfully dissent.
I would vacate the order granting summary judgment for the Defendants-Appel-lees and grant the motion for summary judgment on behalf of Pláintiffs-Appel-lants on the ground that section 4454 is on its face unconstitutional.

. A number of Supreme Court Justices have expressed doubts about the continued utility of Lemon. See Lamb’s Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 398, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring) (noting that “no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature's heart ... and a sixth has joined an opinion doing so.”) Despite this, in 1997, the Supreme Court invoked Lemon to overrule a prior decision which held that the Establishment Clause barred the city from sending public school teachers into parochial schools to provide remedial education. See Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). Agostini served both to reaffirm the general principles of Lemon and to slightly alter its landscape by merging two of its prongs. Fost-Agostini, an Establishment Clause challenge follows these steps: 1) the government must act with secular purpose; and 2) the government action must not have as its primary effect the advancing or inhibiting of religion. The analysis of prong two is then further broken down into three steps: a) whether aid results in government indoctrination; b) whether aid recipients are defined by reference to religion; and c) whether excessive entanglement between government and religion is created.
The majority concludes that Agostini's revision of Lemon is inapplicable to accommodation cases. Because the majority follows the traditional Lemon analysis, this dissent will rebut that analysis. Nonetheless, while Agostini is factually distinguishable from the instant case, it remains the Court's most recent pronouncement on the proper application of Lemon, and its terms ought not be so easily displaced. Regardless, whether one applies the traditional Lemon analysis or its revision under Agostini, the provisions in this case fail.

. The record in this case reveals that not only is improper custodial care being provided and reimbursed at RNHCIs, but the services provided are themselves sectarian in nature. In general, Christian Science nurses care for bodily needs, bandage wounds, and help patients move about the sanatorium, while Christian Science practitioners administer prayer-healing. There is significant evidence in the record, however, that the nurses, who are present on site and paid by RNHCIs, are practicing faith healing in the sense of giving support to practitioners. For example, there is evidence in the form of affidavits from nurses discussing their religious training and indicating they provide services such as Bible reading and prayer. See e.g. Affidavit of Rulh Anne Cook (App. at 178-187). Appel-lees are quick to point out that the practitioners are the ones who truly promote Christian Science faith healing and that they are not paid by the Medicare benefits. The facts reveal, however, that sectarian services are being provided by nurses. Thus, the statutory scheme allows Medicare payments to support the practice and furtherance of faith healing.

. The majority’s reliance on this provision is misplaced. This provision is intricately related to the unconstitutional delegation of authority at play in this case, an issue more thoroughly discussed in Section C below.

. This leap of faith is all the more problematic when one considers the recent history of the statutory scheme, which reveals that there has been departmental deference to the Christian Science Sanatoria decision-making. See Affidavit of Jenean Erickson, quoting the Medicare Christian Science Sanatorium Hospital Manual Supplement: "While the intermediary has the final responsibility for assuring that all coverage requirements are met, decisions of the sanatorium's utilization review committee with respect to questions of necessity for sanatorium services will be accorded great weight." (App. at 223).